Mr. Roth. Thank you Judge Stewart. Good morning. May it please the court, my name is Robert Roth from Hooper Lundy and Bookman law firm representing the appellant. Now you've got that nice stage voice but you're whispering up here so you know those people on the last row back there are just on the seat to hear what you have to say. So just kind of keep it booming. Mainly I say it because we record the oral argument and in order to be able to pick it up just so give us your thespian voice. The acoustics in this courtroom are diminished over the years. Thank you. I will speak up. In preparing for my presentation today before this court I was given guidance concerning preparing for oral argument in the Fifth Circuit and which suggested that I stayed up front the issues that I planned to address in case the court would have me address something different. So I'd like to proceed in that way. I see basically two purposes for the appellant in the oral argument this morning. The first one is that we are available to answer any questions that the court might have about the Medicare processes that are involved. We believe that we covered them in our brief but Medicare reimbursement litigation has been the focus of of my practice for 31 years including the first five working for the agency and I know that sometimes these Medicare processes can be quite daunting. So we are here to answer any questions that the that the panel may have about how the Medicare program works. But what I would like to do in the time that I have this morning with you is to review the cases that involve the Medicare wage index. We say in our papers that this is a case of first impression and we believe that that's accurate based on the facts but there have been other wage index cases and what we like to do is put this case, though it is in some ways unique factually, in the context of the previous cases that have been decided with respect to the Medicare wage index. Shall I proceed on that basis, Your Honor? Thank you. There have previously been 13 wage index cases around the country. Eight were decided at the circuit court level, previously decided by the 6th, 7th, 11th circuit and there have been five wage index cases decided by the D.C. circuit. The Secretary won five of those cases on the merits. The Secretary lost three of those cases on the merits. In two of the cases that the Secretary lost, the remand order from the court was a remand to calculate the amount due, not to redo the entire wage index but calculate. Without taking you from where you want to be, you're on appeal so, you know, maybe the easy path for us is affirming below. So help us understand, A, if your arguments hone in on that the court below erred as a matter of law, then help us understand how those cases you're citing relate to that or if the district court overlooked those, wasn't aware of them, et cetera, to understand if it's legal error. I mean, there's no dispute about the error in the computations, et cetera. So are we looking at an error of law by the district court with respect to the cases you're citing since you say it's a matter of first impression for us? Yes. Well, of course, as in all Medicare cases, they're reviewed by this court as de novo. So the district court, this court is not bound by the district court except to the extent it finds it influential. And in the four pages that the district court wrote, the district court did not give any explanation about its reasoning, but it did say one thing that was quite important and helpful and we think accurate. It said, if a hospital notices an error, as we said in our reply brief, the threshold question in this case is whether the requirement to review the May 2nd, 2014 wage index list was a requirement that the hospital had to exhaust in order to get judicial review before the courts. And what we said is that clearly it is not because the language that the court used, excuse me, that the language that the secretary used was should. And as in the foot case and as in the Palisades case, the courts held that that's just not mandatory language. You need shall or must, not may or should. They explicitly addressed those different words, but the district court said, if a hospital correctly said, if a hospital notices an error, it doesn't say that the hospitals was required to. The district court then went on to say that under those circumstances, there were required deadlines that needed to be met. And we agree with that entirely, but those requirements aren't triggered unless the place in 2017 and the secretary has conceded that it can't by lack of argument, that it can't be applied retroactively to 2000. Notice is given to the hospitals in a particular geographic area. Once those values or rates have been set, is there any notification that would trigger them to double check it? Or should they just do that as a business practice? Oh, by the way, check it now because you may be bound by it once we get past X date. No, no, good question, Judge Engelhardt. As of 2017 for the 2019 process, the secretary, for the first time, imposed a requirement that if that hospitals need to check wage index errors that were not related to correction, in other words, post-correction errors like we have here, it certainly would have been a good idea. There's no question about that. But the question here is whether it was required. And what happened here is that there was this back and forth that went on for 17 months between the secretary's contractor and the hospital to get this thing right. And then they finally got it right. And then the hospital thought, okay, we're good, we're good. But what happened is the contractor sent wrong data, sent the wrong data. And it's only because they sent this wrong data that the secretary then used the wrong data to calculate the amount in controversy, excuse me, to calculate the wage index. And it is that that we're saying we have the right to review because although it would have been a good business practice, it was not required until the 2019 rulemaking process. Is there any dispute that, what is it, CMS, we've got several acronyms here, the MAC collects the wage data or whatever the values and does a fault, I use the term in quotes, fault or negligence is really that of CMS who served as the gatherer of this information? Well, CMS through its contractors gathers this information and the information was provided to CMS. So I think that it was CMS's problem because CMS had the correct information. Right. And what happened is they used prior data, which was admittedly correct. Exactly. Okay. Now, is there any recourse against CMS that's not part of this case? Oh, there's total recourse against CMS under 1395-00-F1. But the CMS's first mistake was knowingly using incorrect data, knew or should have known because they had the correct data. But the second mistake was refusing to admit its error, right? In other words, we brought it to the Secretary's attention and it was like, hey, listen, that is a problem. Your contractor sent the wrong information, fully expecting them to say, no problem, we'll correct it. That's what they did in that Methodist case in 1994. Same thing. But instead dug in their heels and said, well, no, we're not going to correct it. So why not? Well, you didn't review the May 2nd publication. It was like, well, you didn't require us to review the May 2nd publication. But the and if the correct information had been used, Hendrick Medical Center would have gotten the additional $2 million to which it's entitled. We're not asking for something that they're not entitled to. That's the right answer. And the Secretary used the wrong data. Now, the Secretary raises questions about budget neutrality of the wage index and retroactive correction of the wage index. Those are non-issues. Those are non-issues as a matter of law, because we're not asking the Secretary to redo the wage index. We're not asking them to take money away from anybody. There is a statutory right under 1395-00 for hospitals to seek correction of the wage index. And that's why I said of those eight cases that were decided on this basis, in none of them did any court ever hold that a hospital didn't have the right, didn't have the right. And in fact, in the Sarasota case, in the 11th Circuit case, the Secretary stipulated that retroactive relief was available. And who knows? I didn't go back and check those pleadings. There may be a judicial estoppel type of process that should apply here. But fundamentally, Your Honor, you're absolutely correct. CMS had the correct information. During the administrative process, we said to the contractor there, that MAC, well, why didn't you tell the hospital that you were changing the data? And then we would have checked it to make sure it was correct. And the answer was, well, we didn't even realize we'd And that is the reason that they sent the wrong information. And then there was no notice to be given, because in their mind, they didn't realize that they had negligibly made that error. One other question. In terms of review, I believe the Secretary's brief prominently features some discussion of this 1997 procedure that it says your client could have availed itself. You want to comment on that? Sure, sure, of course. Yeah, there were five cases that addressed the wage data correction process. This is kind of the shorthand that we used. And the first case that came up in that foot case from the Eastern District of Michigan, that was the first one that the court said, hey, look, you didn't exhaust. You have no right to come into our court. And the court in that case focused on the words must, saying that that's different from should or may. Fine. Our case, the Palisades case, came soon after that. We knew what was going on in foot. And so we exhausted. And then what happened in that case is we didn't go to one last step, which was to ask CMS with the agency, it was called something different back then, to correct. And so the Provider Reimbursement Review Board, the review panel below, dismissed the claim. Goes to the district court. The district court affirms the dismissal. Then we go up to the Court of Appeals. And it was unusual, at least in my practice. The secretary refused to defend Judge Kessler's decision. They said that, you know what, we used the word may. So we agree that it was a voluntary level of review. And that's our position here, that the review of the May 2, 2014 public use file of wage data was a voluntary level of review. Now, what happened after that, there were three more wage data correction cases that we had. Adventist Dignity Health and Bay State Franklin. But in each of those cases, and unlike here, the hospital that had the incorrect data never even sought at all to try to get it corrected. Never at all. And other hospitals came in and said, hey, look, we're prejudiced by your failure to correct your own data. And the government said, well, you know, it's too late. And in fact, the oral argument in that Bay State Franklin case was just heard by the D.C. Circuit on October 25th, a month or so ago. And you can hear in the judges' voices the concern about the fact that incorrect data was used to calculate the payments that were made to the hospitals in that case. So the distinguishing factors in one of those cases was dismissed because the hospital failed to procedurally, because it failed to appeal one aspect of the administrative decision. One of them was settled for $7 million by the secretary. The papers are in the record here. And then the other one is on appeal before the D.C. Circuit after the final decision upholding the wage index was affirmed by the district court. But the point is to say there has never been a case, there has never been a case where a hospital used the wage data correction process to correct its wage data, which the secretary concedes, and then the contractor and CMS then used the wrong wage data. There's just never been a case like that before, Your Honor. Well, what's the, as mentioned, it's undisputed the error was made. What's the responsibility of the statute for your client, I mean, when one of the errors, made to notice and to exhaust? I mean, below much of the discussion about failure to exhaust, the remedies for correction. So what in the statute best aid your client? Right, right, Judge. This is very different from your Paladin Community Medical Center case from 2010, where there was a statutory preclusion, a statutory provision that precluded judicial brew. There's no, there's no provision like that. There is no statute, the statute in, the only statute that the secretary is operating under requires the secretary to have a wage index. The, the, the, the, the, and the, so the exhaustion requirement here arises through the regulatory process, not through any statutory process. And the statutory process, 1395-00, gives the explicit right of providers to appeal. Let me ask my question this way. I mean, there are a lot of layers here in terms of exhaustion, et cetera, et cetera, in these cases. Tell me succinctly, what is the holding you're seeking from this panel with respect to this labyrinth of layers, administrative bureaucracy, et cetera? I mean, what is the, Errol Ball, what is the specific holding you're seeking from, from this panel? Thank you for asking me that, Judge Stewart. The first holding is to reverse the finding by the Provider Reimbursement Review Board that the, that the, that there's no jurisdiction because of the hospital's failure to exhaust its administrative remedies, finding that the hospital did exhaust the administrative remedies, then having done that to order payment because there are no facts in dispute. This does not need to go back to the secretary except for payment with interest of the amount that was not paid that should have been paid based on the correct facts. Well, the, the district, district court held here that the exhaustion requirement was a duly promulgated rule designed specifically to address the issue. Hendrick alleges it caused the error. CMS or MAC errors made in the entry of the final wage index data that resulted from the correction process. He concluded that results may be harsh, but the deadline for administrative exhaustion was clearly set forth and properly noticed. Now, where did the district court go wrong? Well, the district goes, went wrong. It started out right because it said if a hospital notices an error, uh, and then, and then identified required deadlines under if that condition is met. But where it went wrong is that not only was this not explicit. Break it down. Is there a duly promulgated rule designed to address the issue? We believe not your honor under the, what is the rule? What's that? What is it? What do you believe not? Well, what do you believe? I mean, what, what is the rule? Oh, we don't believe that. With respect to the wage data correction process, it has never been adopted in a, in a regulation through the notice and comment rulemaking process. It's only been in preambles of the rulemaking and it's never been embodied in a final rule. It's only been addressed in the proposed rule, the wage data correction process itself. 79 fed rag at 28 0 8 1 0 8 1. Yes. Right. And that regulation doesn't, doesn't support the district court's conclusion. Well, that federal register is the preamble of a federal register notice of proposed rulemaking, not a final rule. So your argument then narrows down to the there are no regulations that address the wage data correction process, never been adopted in the code of federal regulations at all. Okay. Well, I'll ask you one concluding question of all the cases you cited. I looked at several of those and you start off saying, this is a matter of first impression for, for this panel. So which is your best case to get the relief that you seek based on my question of the specific holding that you're asking the panel for? What's the best case for you to get that hold? Well, I think our Palisades case, the 2005 DC circuit case, where the secretary refused to defend on appeal, the concept that a, that a part of the wage data correction process that used the May, uh, was, was mandatory for exhaustion processes. Uh, that, uh, that I think is extremely helpful. Sarasota for the purpose that wage data, correct wage index cases, uh, the stipulated fact by the, by the secretary that retroactive relief is available as a matter of law. All right. All right. Thank you. Thank you. From the secretary, Mr. Stoltz. Thank you, your honor. May it please the court. My name is Brian Stoltz on behalf of the secretary. I'd like to first address the argument that council, uh, made that there has never been any sort of procedure adopted by regulation to deal with this issue. Um, we, we disagree with that and I can explain why there's been multiple notice and comment rulemakings in which the district court was on very firm ground to make its conclusion that these were duly promulgated rules. And I'll, I'll discuss some of them right now. Um, first in 1997, there was a rulemaking, a notice and comment rulemaking that resulted in a final rule in which the secretary expressly adopted the procedure that has been used here, including whereby there is a May, uh, there's a file that's issued in May. And the rule in 1997 said that if, if the, the hospital is supposed to check this file to make sure that the wage data is not incorrect due to an error in data entry or transmission, that's exactly what occurred here. There was an error in data entry or transmission. Uh, that, that regulation, which was adopted in the final rule is at 62, 62 Federal Register 45993 adopted in 1997. Um, there's a separate regulation that was also adopted in 1997, 0.64 K. That regulation states that a so-called midyear correction to the wage index, in other words, a correction after the wage index has already been set can only be made if the hospital can show. So the burden is expressing on the hospital. The hospital must show that the contractor or the CMS made an error and that the hospital could not have known about or did not have the opportunity to correct that error. So this is a separate regulation that likewise makes clear that the hospital must show that there was no way for it to know about or correct the error. Um, another notice and comment rulemaking is the 2014 rulemaking that's at issue, uh, in this case specifically. In, in other words, that was the wage index. How was, how was the hospital, uh, to learn, uh, to the error that was made? Oh, Your Honor, the, the hospital is to learn the error that's made by checking the final public use file that's published or that's, that's released in May of the year. And, and, for example, at 79 Federal Register 28-080, that's the proposed rule, uh, that was in effect at the time. Uh, the, the, this has wrinkled to it. It's sort of a second level of correction. There was an initial error and it corrected and they had the right numbers and now the contractor then transmits the wrong number. That, that is correct, Your Honor. What is the significance of any, uh, that, that the case arises in that posture rather than the error on the, on the initial error itself? I don't think there is any significance because the, the rules specifically contemplate that there may be a error in transmitting the data in this manner. Uh, for example, at 79 Federal Register. You had already corrected some numbers that would have been generated, correct? There were two corrections that were made. So, when a preliminary public file was released in the preceding September, uh, there was an error that had been spotted and there was back and forth between the contractor and the hospital. That error was corrected. Who spotted the error? My understanding is that the hospital spotted that error the first time and it was an error that was embedded within their own prior reports. So, they realized after reviewing this file, they knew the process to review the file, they found an error, it was corrected. There was a subsequent public use file that was released. Then the MAC made a mistake in transmitting it or what? So, after the second public use file was released in March, the MAC, the contractor, noticed that there was another. The CMS is contractor. Correct. The CMS is contractor and, and we're not running away from the fact that it's our contractor. The contractor noticed that there was another error in the data that Hendrick had supplied. There was missing data. There was not any data for the food costs, essentially, of their food service personnel in the hospital. So, there's an email exchange and, in fact, this is at around page 561 in the record where the contractor raises this issue. Hendrick then supplies the missing data and there's an email saying, okay, now we have it. Now, the problem is, so Hendrick, Hendrick knew as of March 2014 that its data was going to be changed. Logically, then, in the May 2014 final file, that's where it would have seen that this data was, in fact, inputted correctly and transmitted correctly. Well, in that May 2014 file, because of an error by the contractor, the data was not inputted and transferred correctly. So, that's where the error occurred. But again, and again, it was an error, but if you look at the, you know, what the Federal Register says about this is the whole purpose of post... The hospital then should have what? They should have followed up and learned of the second error how? Correct. So, the... No, how would they learn of the second error? The way they would learn of the second error is on May 2nd of 2014, these final files were posted. Per the Federal Register, the contractor or the hospital knows that it can check these public files... How long do they have that publication until it's given notice? They have until June 2nd, so essentially one month. There's a June 2nd deadline to point out any errors. They have 30 days to correct it. Correct. So, at any time during this 30-day period, they can say, you know what? We've reviewed this May file that you've posted and you have our numbers wrong. It's exactly what had happened with an earlier file. Is there any notice that goes out in connection with the May 2nd posting? Is there any type of transmission to finalize and it's here for all to see? In other words, sort of like a check it now or too bad later? Yes, Your Honor. There's a couple different ways that notice is provided. So, one, at the very beginning of this process... I'm sorry, not to interrupt you again, but when you answer that, if you could also tell us if there's any notice that's mandated and where it's mandated. So, just what notices are given. At the very beginning of the process, what's referred to as a timetable that's posted on the CMS website. This is discussed at page 195 of the record. The timetable sets forth all the deadlines that are going to be in effect for the whole process of setting the wage index, including this June 2nd deadline to basically seek a correction of the May file. So, that's one timetable. And it's undisputed that Hendrick was aware of that timetable. They took advantage of it. The board found that Hendrick knew about the deadlines in the timetable because, again, they used the timetable. A second form of notice is from the contractor itself. 456 through 78 of the record and also at page 416 of the record, there's an explanation that the contractor posts what they call informational alerts during this process on their website to basically advise the hospitals again that this new file has been posted. If there's any errors, let us know. So, that's another form of notice. Another form of notice is, of course, the Federal Register itself, which was very explicit, saying we're posting this file. If you believe there's an error due to contractor or CMS data entry or transmission, which is exactly what occurred here, there's a deadline of June 2nd, 2014 for you to notify us. And the Federal Register, including in the final rule, which is at 79 Federal Register 49986, it's very explicit that if you do not take advantage and you do not, you know, submit a correction now, you will not be given a chance to later submit a correction. And it even says you will not be permitted to challenge later before the board the failure to make some revision, and that's exactly... Any recourse whatsoever after June 2nd, or are they...the die is cast and they have to live with those figures? Correct. You have a 30-day period to object to the figures, and if you don't do it within 30 days, those figures are essentially finalized. And CMS has explained... I could focus for a moment on the triggers of the 30 days. You've talked about multiple publications. Do each of these publications trigger 30 days, or are there several sources by which they should have known? Now, what triggers the 30 days? Which of those notices do that, or do all of them do it? All of these notices... All of them, they were published simultaneously. Correct, Your Honor. So it's akin to...there's rules that are published in advance, including at the very beginning in the timetable that's posted, and the timetable says, in September of the prior year, we're going to release the first public use file. If you think there's an error in that file with respect to your hospital's data, you have until, let's say, October 2nd to do it. And then there's further iteration. Then we get to February, and again, all these sources say, okay, once we post the February file, which will go up on February 2nd, let's say, you now have a March 5th deadline. We do some more iterations. We continue to audit the data, and then you get to the final file, which is May 2nd, and there's a deadline that's June 2nd. So these deadlines, that June 2nd had been established in 2013 at the very beginning of the process. Does that answer the question, I hope? Yes, it's responsive. Well, if there's something else that... Is it clear in the record, or is it undisputed, that Hendricks was aware of the Federal Register deadline of June 2nd among the others? Is that in dispute at all? I don't believe that's in dispute. One reason I say that, Your Honor, is so at page 195 of the record is the timetable that lists all these deadlines, including the June 2nd deadline. And at page 202 of the record is Hendricks' explanation that with respect to one of the earlier files, they had reviewed the timetable, which included the June 2nd deadline, and they took advantage of the process earlier because they did review the file. They simply failed to review it, you know, when the May 2014 file was posted. And again, it is a harsh result. As the district court said, it's a harsh result in the context of this one hospital potentially losing out on money. Well, this is not a game. It's not an adversarial process. The underlying issue here is who the money is due to. It's not in dispute. The government owes this money, and it's more than harsh because everybody knows exactly what the number is now. And because it didn't meet a 30-day deadline, that there's no process at all for correcting it. So normally in these terms where you have these kind of cutoffs and so forth, they're justified by administrative necessity of some sort or some justification for them. If the amount is undisputed and there's no really genuine administrative difficulty posed on the facts of this case, then why isn't this invocation of exhaustion here abusive? Well, Your Honor, to answer that, I would say the Secretary has, there's a number of, it may seem like a harsh result for this individual hospital. The Secretary has no discretion here? The Secretary has a strong interest in maintaining the efficiency of the administrative process. How much money are we talking about here? My understanding is that Hendrick has said that it would be approximately $2 million. It's just $2 million to that hospital in West Texas. That's, I understand that, Your Honor. Let me give an example though. In the Bay State litigation that counsel referenced, there was a hospital and there had been money that had, or errors in the data, and it was going to cost the hospital $19 million. And this was an innocent hospital that essentially did not, it wasn't its own data. And the court discussed, you know, quite candidly and in some detail, the different considerations that require essentially and why the Secretary has imposed these strict deadlines. One is the efficiency of the process. All the way back to the 1997 rulemaking, CMS described in that rulemaking the problems that were occurring due to untimely submissions of corrections to the wage index, including hospitals rely on this data. So when the wage index is set in August for the coming year, all the hospitals know that. They know what they can budget for it. And this is discussed in the 1997 rulemaking. Hospitals sometimes seek to switch geographic areas under different provisions, and they rely on what the wage index is. So there's a problem if there's a lack of finality in the wage index. The burden here is being dropped on the hospital for an error of your contractor, the government's contractor. And that's the mistake that's made. And then you say, well, you didn't catch us. You didn't catch us, the government says. You didn't catch our error. So therefore, you lose $2 million. This is an error made in the correction of an earlier number. So the exhaustion of remedies, it's very difficult for me to see the justification that the Secretary has discretion here on these facts. It doesn't implicate the administrative process in general. It only talks about an error that was made in itself by your own people, for which they didn't catch. I would have, I would say two things in response to that, Your Honor. One is, I don't think it matters, I don't think at the end of the day it matters who the blame is assigned to for the error. And we fully admit that the contractor did transmit the error, the data error. I will say, though, that it's not as if the you know, there was an error that they had made that prompted the Secretary, that the contractor caught in March saying, you didn't give us all these dietary costs when you were supposed to have given them to us earlier. And so because of that error, the data had to be changed essentially at this late stage, and then that led to the error. So it was not as if the What end does this administrative process you've described serve? Well, it serves. And the facts of this case, what end is accomplished by this other than the government keeps $2 million, it's not his. It's not a matter of the government keeping $2 million, Your Honor. It is. No, well, the reason I say that is because, and this is discussed in the Bay State case that's cited in the briefs, there's budget neutrality here. So any change to wage index affects the wage index nationally. And in fact, in the Bay State case, there was Massachusetts hospitals that were asking. You don't dispute that this money would otherwise do an owing. I don't dispute that. Well, I'm not sure about that because I don't know what some money would have, if the wage index had been higher for Abilene, there would have been additional money paid to this hospital. I certainly don't dispute that. I do dispute the notion that it's just a matter of writing a $2 million check and that's all. And in the Bay State case, the Massachusetts hospitals were asking to raise their index. Alabama... Are you saying that the error made by your contractor, you don't know what the consequence of that was? No, I do know what the consequence of that was. I know that it resulted in a lower wage index for the Abilene. You gave me a number earlier. Where did that number come from? That's an estimate of, and I think they estimated it at approximately $2 million. And I don't disagree with that at all. What I'm saying is, for example, in the Bay State case, the Massachusetts hospitals were asking the court to raise their wage index. The Alabama Hospital Association came into the case as an amicus and said, if you do this, Alabama hospitals will lose millions of dollars because it's a zero-sum game. If you're taking money from one, you're giving it to somebody else. And so, in the Alabama hospitals, the court in the Bay State case cited the fact that these Alabama hospitals came in and said, well, wait a minute. If you change theirs, it's going to result in these huge decreases for us. So, the secretary has an interest... Would that have happened here? This correction made by your contractor? If you corrected that mistake, that would have what consequence? Your Honor, my understanding is yes, because by statute, these have to be budget neutral. And so, that's one of the reasons... I'm sorry? By statute, what? By statute, the wage index has to be budget neutral, meaning that... You're saying it's going to come out of somebody else's pocket? That's correct, Your Honor. And this is discussed, for example, in the Bay State case, there's a prominent discussion of this fact. So, that's one of the reasons that the secretary has created this process to resolve all these wage data issues in advance of the deadline. Because after you've set the wage index, it's extremely disruptive to change it. And the secretary recognizes that it can be changed under certain very limited circumstances in accordance with that regulation, only if there's an error by the contractor or CMS and the hospital could not have known about the error and didn't have a chance to correct it. You know, Hendrick, unfortunately, does not meet that criteria in this case. And that regulation, that's a perfectly valid exercise of the secretary's to report things. They have to give cost reports. They have to give... There's all kinds of data they have to supply if they want to participate in Medicare. And part of participating in Medicare is you have to meet these deadlines, and if you don't, there are consequences. It's no different... Three questions. First, one of the arguments Hendrick makes is that because the error was the government's contractor, the exhaustion requirement should not apply. And then I guess tied to that argument was the business of the rule saying should as opposed to must. But my first question is, because the error is, what if any cases have waived or excused exhaustion, if any? Are you aware of any? I'm not aware of any, and no, I can't say that I am. The rule is the rule. It's a deadline. I get that. He argues this is a case of first impression for us, and you heard me ask the question, why is this a case of first impression? I mean, there are a whole slew of cases that have been cited, and a lot of them, they all seem to differ in some respects. And as Judge Higginbotham was asking, we're trying to hone in on the specific facts in this case. So what's the case that results harsh or not? What's the best case that fits, affirming what you're asking us to affirm? Your Honor, the Little Company of Mary case from the Seventh Circuit is a very similar case. Now, the distinction that Hendrick is trying to draw is they're saying that the contractor made an error here. I don't think that distinction matters because, among other things, the regulations contemplate that there might be an error by the contractor. We're dealing with massive amounts of data here. In the Little Company of Mary case, the hospital had submitted some information to the contractor. The contractor sent back, saying, okay, well, this is what we think your reimbursement will be based on what you sent us. And under the rule, they had a 60-day period to, you know, basically to say, no, we don't think that's right. They didn't object within 60 days. They later tried to object, and the board says, we don't have jurisdiction because, you know, there was an error. It wasn't pointed out within 60 days. It's essentially the same fact here. All right, let me ask you just a hypo. In theory, you heard me ask him what the holding he wanted. Let's just say, for the sake of this question, we have the no vote review. We were to hold that exhaustion was inapplicable here or something to that effect. As I always say, we don't get into any of the weeds of this. Just, you know, we reversed the summary judgments, determination of exhaustion, and remand. What would the consequences of that be given this whole labyrinth process? Do you understand my question? So, if I'm understanding the question is, if the court were to essentially reverse and there was no exhaustion requirement here and then remand to the board. I'm not saying that's what we do. I'm just trying to work my head through these permutations that are teed up here, given all these layers. We've got it up on summary judgment, but it's the no vote review, and we've got the record, and so we don't, whatever we do, we don't have to go through the length and breadth. I mean, we've got this sort of narrow issue. He says, should. You say, must, you know, and that. So, I'm just asking if we were to reverse either holding exhaustion not applicable or something to the effect of sending back. I'm just wondering what's the process? Go back to the district court to do what or back to the agency or what? I think it would have to go back to the agency. You would essentially be reversing the agency's determination that it did not have jurisdiction to entertain the administrative appeal, and if it went back to the agency with the holding that the agency board does have jurisdiction, then the agency board would take it from there. Presumably, they could attempt to implement some kind of equivalent of a midyear correction to the wage index, which, as we discussed, would have to involve essentially leveling it among everything else, and you did address that on page 79 Federal Register 28080, and then also in the final rule at 79 Federal Register 49986. That's where this should language comes from, and it does say, if there's an error, you should contact CMS or the contractor. It goes on to say, though, in very clear terms, you know, that you're required to do this by June 2nd. If you don't do it by June 2nd, you waive the right to submit a request later, so I think this should issue is, you know, the language is very clear that this is a mandatory requirement if you want to preserve your right, you know, to later do anything with it, so, and in fact, in the case where this should thing comes from, if you look at that Federal Register, which is at 64, 64 volume, page 24731, with respect to this May deadline, that version of the Federal Register also had very similar language about if you find an error in the May data, you should notify the contractor or CMS, so there's no, that distinction doesn't, in my mind, there's nothing to that. The language is very clear that it's a mandatory deadline. Well, there is a large difference between should and must when the draconian outcome is the loss of the inability of the court there, I must say. Well, you ought to do this, but what does that do to you? Is that fair notice? I do think if the court reviews the Federal Register pages at, again, as I said, in volume 79 at 28080 and also at 49986, I would submit. To be clear, what you were talking about in the preamble of the 2015 proposed rule makes it clear that this was a requirement because it uses the word should instead of must, the hospital should, and so must notify. It's the second level of MAC. It's what it's referring to, and it uses the word, you should do this. It doesn't say must do that. It does say you should do it, and if you don't do it, you waive the right to later do it. I would submit that. If you get that in front of me, the language is going to continue on with the default provisions. That is the consequences. I'm sorry, Your Honor. It will include an explicit statement that failure to do this, the consequences of that are stated. That's absolutely right. If the court reviews page 28080 and also 49986 of volume 79 of the Federal Register, it is absolutely clear from that page that if you do not meet this deadline to request a correction of an error, a data error by the contractor or CMS. Is this rule that you are seeking to enforce, did it ever go through a notice and comment period? Yes, Your Honor, it did. In 1997, we discussed in our brief, that's when the agency first adopted this procedure of we're going to put out a file in May, and then we're going to have a deadline in June. That's when that was first adopted in 1997. The exhaustion language, was it went through a notice and comment rulemaking? That's correct, Your Honor, in a couple of ways. I would refer to volume 62 of the Federal Register at page 45993. That is a final rule after a notice and comment rulemaking. The agency specifically said, we're thinking of changing our process so that we're going to publish a file in May, and there will be a deadline in June to request correction. They received comments on that proposal. They discussed the comments. They adopted this procedure in 1997, and then it's been reiterated every year in all the annual wage index rulemakings. Let me ask you one thing about that, and I think this is pertinent to what you were just talking about. With regard to the wage index timetable, you've referred to it several times. On the record on appeal at 895, which is part of the stipulations that were entered into to decide the case, it says, notice must be forwarded by FIS MACs to alert hospitals to the availability of the final wage index. Now, there's a must as opposed to a should. Was there any type of individualized notice sent to Hendrick or any other provider pursuant to this language? I don't believe there was individualized notice in the sense of a one-on-one communication. I think around 456, 478, 416 of the record, there's a discussion of what the contractor did by posting these alerts, and that was the contractor's way of providing this notice. Is that the same as you're saying that's the same as notice must be forwarded to alert hospitals to the availability of the final wage index? I think starting at page 456 of the record, there's copies of these alerts that the contractor put out, and the provider reimbursement review board made a finding that notice was provided and that Hendrick, in fact, had notice of the timetable, and in fact, they've admitted that they had notice of the timetable. They talk on page 202 about how they reviewed things in accordance with the timetable. So that's, you know, the board found that they had notice, that they had deemed notice, that they had actual notice. We would submit that that finding is certainly under the deferential standard, you know, that applies. That finding should be affirmed. So we'd ask the court to affirm the district court's decision that the provider reimbursement review board did not err in deciding that it could not entertain this appeal. Thank you. Mr. Roth, do you have your rebuttal? Thank you, Your Honor. I mean, clearly, this panel is extremely well aware of what's going on in this case. I have just a few mop-up points to make, and obviously, if the court has any from the secretary's perspective, when it says must, that's not binding on the secretary, but if it says should, that's what's binding on a regulated entity, and that's just not how the how the APA works. With respect to the consequence of this case, this is a one-off case. I am not aware of any case where there had been a unilateral contract or error like this that the secretary has refused to correct. So there is no consequence. With respect to this concept that there's going to have to be a revisiting of this wage index, and this wage index is going to affect other hospitals, we're talking about two million dollars here. The total Medicare payments that issue for that year were over 110 billion dollars, and the Sarasota case makes clear... 10 billion here, 10 billion there. But it makes clear that this kind of retroactive relief is we're not looking to have the wage index recalculated. We're looking to have the money that we're entitled to pay, and so budget neutrality doesn't come up in this case. There was a discussion about what is, I mean, fresh in my memory, it's been a while since I read, I mean, what is specifically, it's not disputed that Hendricks Hospital knew of the magic dates, etc., etc. So was it a conscious decision not to respond or what? I mean, there's not a dispute. I mean, we talked a lot about notice and so forth, but it doesn't seem there's any dispute about notice, right? I mean, your argument is that notice shouldn't matter? Oh, well, the result's harsh, but this is a different fact scenario when somebody said, I didn't know, I got an earlier load, they didn't send it to me. That's not at play here. I mean, it's all the cards on the table. So there's your client saying it doesn't matter if there are these deadlines, because it's the contractor's error, exhaustion shouldn't be required. Is that the argument? I mean, I get it, you know, it's 2 million here, but at the same time, we also have to think about other cases. So is that the argument? Oh, no, no, no, your honor. The Hendricks Medical Center adheres, believes in these deadlines. Absolutely. Well, then why didn't he, I know the why question is dangerous, but knowing about it, and the consequence of no response, I mean, what's the argument? Oh, well, let me say, but first of all, it wasn't a requirement until 2019 rulemaking. So there was a deadline, but it didn't become a requirement until after this time period. So that's legally what was going on. So not responding is inconsequential as relates to this issue. That's because of the should business. Is that what you're saying? Well, it's not a basis for depriving a statutory right, some kind of should language in a preamble of a regulation. But let me explain what's going on here factually, because I think Judge Stewart, you're touching on something that's extremely important here. On May 2nd, 2014, the final data comes out. Okay. Now what happened is on March 24th, 2014, everything was corrected. Everything was done. The proposed rule comes out then two weeks later, right? And there's a, there's in the proposed rule that came out on May 15th, that included with it a list of all the data. And in that listing in the proposed rule, Hendricks Medical Center's data was correct. It was correct. So it had a March 4th, March 24th, it was corrected. May 2nd, the final comes out. May 20th, May 15th, the final, the proposed rule is published with the correct data. And the hospital thought it was okay. It thought it was okay. Did not anticipate that there would be a unilateral MAC negligence that changed right data to wrong data. And then by the time it checked it, when the final came out, the government says, oh, it's too late. And it's like, well, it may be too late, but this was the right data. You had the right data the whole time. Oh, well, it was too late. And so that's why we're making all these kind of technical legal arguments about shoulds and exhaustion and taking away the right. But what's going on here fundamentally is that the hospital corrected its data. The proposed rule had the correct data in it. The secretary through his contractor changed that data and the hospital thought it was home free. Turns out it wasn't. And that we don't believe as a matter of law that that's reasonable. And there was a question about whether there is a process, whether there was a governmental interest at work. There is no governmental interest to allowing MAC errors to go uncorrected. And that's what the secretary is asking here. The secretary is saying you're not even permitted to come to court to ask for this correction. I see my time is up. All right, Mr. Roth, you've completed your rebuttal in this case. That concludes the argument in this first place, 19 dash one.